Good morning. My understanding, Mr. Lobeson, is that you will take seven minutes and counsel for the EEOC will take eight minutes? Yes, that's correct, Your Honor, and Ms. Sloan will reserve five minutes for me. All right, so she's setting the clock for you specifically then. You may proceed. Thank you. I appreciate that. Good morning, Your Honors. Your Honor, my name is Jim Lobeson. I represent Ms. Sanchez, Ms. Lua, and Ms. Barajas. I'd like to make maybe four points, if I may. First, this is not a case where the misconduct is just related to a single statement. This is a case where four improper themes were woven together. There were at least eight improper statements, and the major, most egregiously improper theme in many ways was the theme that poor people tend to cheat and lie and steal because they need money. Mr. Evans Fruit described to the trial judge this theme of theirs as a big part of the theme of our case, and indeed it was. With respect to the eight improper statements that you've just discussed, how many of those were objected to? I think they were all objected to except the comments about poverty. The others were all objected to, but the comments that poor people will steal was not objected to, and those are before the court for your consideration under the plain error standard. Thank you. They referred three times to the fact that the Evanses were white, and that is what one court has described as a magnificent error. Are you talking about before the jury or not before the jury? I'd like to have you identify comments that were made before the jury because ultimately you got a jury verdict here. Right. I believe, Your Honor, they referred to it once in front of the jury and twice in front of the trial judge. So it's only in front of the jury that really matters, isn't it? Well, yes and no. I think it is related to the other arguments. But the statement to the jury was just one sentence in closing argument. That's the only time the jury heard any of these reference. I mean, the brief just makes you feel like it was just all over the place to the jury, but the truth is the jury heard one sentence. Is that right? As to the word white, that's correct. As to many other things, they heard a lot about... Your argument at the moment seemed to be race related. Right. I want to talk about the plain error standard and the poverty card which was In Romero-Avia, the prosecutor argued that the defendant was unemployed, he needed to make some money and that's the obvious motive for him going out and engaging in crime. The court, that was not objected to in the trial court. The court applied the four-factor test for plain error, and they said that the defendant met three of the four. The court said the first factors was there error? They said there was error. It was clear. The second factor was, was that error clear and obvious? The opinion says it's been obvious since 1989 that you can't do that. The court says it's been clearly established that poverty alone does not indicate a motive to commit crime. That's been the traditional view of the law, and it was known well before. Here, they were not arguing just poverty alone. I mean, they were arguing inconsistency in statements that they would, I mean, the impeachment of these witnesses was fairly strong about, they made little statements and then they got ratcheted up to higher and higher statements. So, it wasn't just the reference to poverty. It was, look at all these inconsistencies in the facts of what they're saying. Isn't that correct? I would partially agree with you, but I would say that as far as a motive for doing this, a motive for trying to steal money from Mr. and Mrs. Evans, which is the way they, they argued it explicitly. The only motive they gave was that these people are poor, and they pretend, they, they profess to express sympathy for them. They're, well, they're poor people, and we should have some sympathy for them, but the only motive they gave was that they were poor, and that cut the legs out from the credibility of all of them. They said that... Why, why would it have done that? Because if you can't believe people because they're poor, it doesn't matter how many of them you have. What you have, what their, their argument was, you have a grand conspiracy here. All right, that's fine. The one question I have, too, is that this sort of rich-poor theme, if you will, seemed to be played by both sides. So, there's some extent that the Evans Fruit Company is a big company. They've got low-paid workers, and that's, they're basically profiteering off of low-paid workers. And so, now we have the economic disparity just on the table by, you know, EEOC and the interveners. What do we do with that in the calculus? Because it seems to have been introduced by both sides. Well, I think what they want to say is that if you point out that a company is large and has that supervisor then engaged in sexual harassment, and they didn't care, they, the company, didn't care about it until they found out that the supervisor was stealing from them. I don't see how that opens the door to Mr. and Mrs. Evans are people who don't care about their workers. And the other point to be made there is that it is the company that raised a Faragher defense. The company raised the defense that we have an adequate complaint procedure in place so that why didn't these women complain to us? Since they raised that affirmative defense, you can't blame the plaintiffs for coming back and saying your procedure was to talk to people who can't speak Spanish. And then they want to convert that into things saying, well, you brought up the fact that they can't speak Spanish and that most of the plaintiffs can't speak English, so you're the ones who brought up either. But if I could in my 30 seconds... You didn't really quite hit on the fact that there was this sort of big, small, rich, poor put on by the plaintiff, even unrelated to Mrs. Evans, about the company basically, basically leveraging low wages. The plaintiffs didn't say rich people lie. The plaintiffs didn't say rich people steal. No, but the plaintiffs... So that doesn't open the door. But the plaintiffs got the ambiance in there. Look, there's this great big company that has all these assets and they're really concerned about money because that's when they fired. That's when they're concerned. So they didn't say the words, but the undercurrent of these are really rich people, you certainly got the flavor of that from the transcript. Your Honor, I might seem I'm gonna run into her time. The last point I wanted to make was the whether or not it was prejudicial. And I submit that under Romero-Avia, it's already established that we meet criteria one, two, and four. The only question is on the poverty card issue is whether or not we meet the third criteria, which is whether or not it's prejudicial. And it's egregiously prejudicial to say you can't believe any of these people because they're poor. The reason they were saying you can't believe them is over and over when you read the transcripts is because they change their stories. The impeachment that at least I was aware of was, look, they said this and then they later came back and said it's stronger and then they later came back and said it's stronger and then stronger and they're related to people. And it seems to me that was the essence of the impeachment challenge. Well, I would have to agree with you in part, Your Honor, but I would leave you with this thought, which I've given a good deal of thought to. There are 15 women here. I represent three of them. Some people are impeached to a much greater degree than other people were impeached. I would submit to you at least that if you look at the three people I represent, at least in particular Ms. Sanchez and Ms. Lua, they were not particularly impeached. They were impeached in the sense that they said, well, you didn't say that at your deposition. Depositions where they're speaking Spanish and it's being translated twice. I don't think they were seriously impeached. You might have to go through the analysis, I suppose, 15 times to see who was prejudiced and who was not. But I don't think that's fair. But I mean, isn't it a pretty common strategy and acceptable strategy to impeach people because their deposition didn't say one story, which they then said at trial? Isn't that a pretty standard method of impeachment? That's totally fair. But the question you have to answer is, was playing the poverty card prejudicial? Or can you just say that doesn't matter because they were impeached with some inconsistencies and there's some things they said at trial that they didn't say at deposition? I don't think you can say that. Thank you. Good morning, Your Honor. Barbara Sloan for the EEOC. I would like to sort of dovetail on his argument. In the opening, there were two big themes. These people are liars and you can't trust EEOC. And if it were really so bad, why didn't they complain? The evidentiary rulings that we were addressing, you have to view in the context of those themes because they just played beautifully into them. There were problems with hearsay analysis. There were problems with foundation. There were just repeated errors in evidentiary rulings, which seriously prejudiced the Commission in light of these themes. We start with Apristina, for example. I'm going to call her Apristina because Manjari's Hernandez is just too long. She had a very strong story. She worked there a long time. She was a little older. She'd been harassed physically when she was younger, but that was excluded. So most of her harassment involved verbal comments that Mr. Nguyen made to her and were disgusting. And as we went along, the defendants started raising hearsay objection, hearsay objection, hearsay objection. Some of them were overruled and then they started being sustained. What happened then is that interrupts the flow and it starts playing into, oh, you can't trust this person. She's lying. And then part of one of the things that was excluded was she was going to testify to why she didn't complain. Why didn't she complain? If it was really so bad, why didn't she complain? She was going to testify to why she didn't complain. That was excluded on hearsay grounds. I do have some question on the hearsay. It seemed that much of what was argued in the trial court were limited arguments against hearsay, and then the EOC sort of shifts those on appeal so that, you know, there may well have been good reasons. For example, the fact is that these people were party opponents. You know, it probably would have come in. I don't know where that objection was in the trial court, but I don't really see it. So my question is this. If the trial judge is presented with certain arguments on hearsay, any rules on those, and there might be other good arguments and you don't really stylize those until on appeal, which ones do we look at? Well, you can look at the original ones, Your Honor, where they . . . You're going to stand by the original ones? I think it's obvious that they are also high-ranking managers, and some of the . . . for example, the evidence regarding the complaint procedure, that was conduct acting within the scope of employment, and it shouldn't have been excluded on that ground either, but it also . . . But you didn't argue that ground? We didn't. I mean, it was kind of inconceivable to me that the most obvious ground for hearsay wasn't argued, so the trial court's not addressing it. But it's a harassment case, Your Honor, and the conduct would mean that the statements were not offered for the truth. And so they're quintessentially not hearsay. That's how you prove a harassment case. But in other words, just because you view them as not hearsay, you didn't make the objection that even if they were hearsay, they would come in as a party admission or a party statement. There it is. So anyway, so we had this problem with Efrasina. There's all these objections, including this photo, which they used to undermine her credibility again. She's lying. She's just lying. So we . . . two themes. She's lying. Let's talk about the photo, and I appreciate your overall theme, but we're trying to look at the evidence somewhat granularly. She says she doesn't know this person, right? She said she knew Angie, but not well. And so then they have this picture at a shower or a party, and they say, well, isn't this you? And, you know, isn't this this person? And you were there at the party. I mean, a lot of hearsay is almost . . . I mean, a lot of impeachment is not very consequential to the jury, we often find out. But what would be error about asking her that? Well, the photo shouldn't have been in the first place, Your Honor, because the most likely time that the photo was taken was in the 90s. And because the Marines had been married since 1984, so they might have had a baby shower between 2003 and 2013. But the good chances is that it was a lot earlier, and they never asked anyone . . . And she could say that. She didn't. She did say, I don't know when it was taken. I have no idea. And the court said . . . So then the jury could see . . . Well, they shouldn't have admitted it. She made her story, right? There was no foundation for the photo. Anyway, so in our view, it undermines the credibility. Then we go on to the next person. She's . . . that's when the standard starts to change. And we've prepared our witnesses. We've not asked them to identify who they saw and heard being harassed. We've just told them to . . . that they can testify, because that's what the rule was. You can testify about incidents that occurred, that you were aware of, once you've been . . . once you've established your story. So that's what was going to happen here. Incidents were excluded, and so was why she didn't complain. So there's the two themes again. Then Alvarez comes in. Her original . . . she's first harassed back in 2001 by a crew lead, and Marin does nothing about it. So there's why didn't she complain, and there's she was harassed by a crew lead. She has a very powerful story that she's going to tell about being assaulted by Marin, where she's going to shout out, why . . . no wonder your crew leads do what they do. They had a good teacher. I mean, excuse me, they're just like the boss. And then Marin's going to say, basically at admission, yeah, well they had a good teacher. They do what they're told. But we can't get in that statement, because of the Morgan exclusion, which was wrong. Well, the judge was simply saying at mid-trial, look, if you're going to testify about just general things that you've heard that don't apply to you particularly, we don't want just amorphous statements that are just undefined. Was that error, do you think? We don't want . . . Or are you complaining because that was a change in the court's ruling? We are complaining about the change because we had not prepared our witnesses to identify people. But in this case . . . But that change happened after, what, the fourth day or so? Right in the middle of Alvarez's testimony. And you made a general statement that has changed your strategy, but I didn't see, or at least I'm not at this moment remembering, specific statements about how that changed your strategy. That is, specific people that you said, we couldn't call back, or we didn't ask to be able to call back because of your change in ruling, Judge. Proffer of what they would have said. I don't see any of that. Is that correct? It was narrow. The new standard was narrower. It was, but I mean, did you ever say to the judge, now we want to call these people back, we'd like permission to come back because you've changed the rules? No, because the standard was lower, it was higher. If we couldn't get this stuff in under the old standard, we're not going to get it in under the new one. Anyway, so I would argue to you that Alvarez, what happened about Alvarez, plays into those two things. Why didn't she complain? Because she did complain, and they kept that out. And why, we can't even testify about this one, she can't testify about this big incident that occurs to her. It's kept out. They're trying to, EEOC's trying to hoodwink you, Jury. If the jury verdict with respect to hostility or hostile work environment is sufficiently grounded, then the argument you're making now about why they didn't complain and the company was on notice and that sort of thing, wouldn't that really be harmless error at that point? Well, Your Honor, we, I think it's very prejudicial, but we agreed in our reply brief that, and I do want to reserve a little time to talk about sanctions. Well, you're way over your time already. I know. You're already almost two minutes over your time. I do want to talk about sanctions. If you had answered the question, that would be helpful. Yes, I absolutely will. We acknowledged in our reply brief that some of the people have stronger claims than others, or we have stronger claims with respect to some. The only person I've ever seen was one we think has a very good claim. So does Granado. She was not impeached. So did Garcia. She was, I mean, impeached in little ways. We're talking about something that happened, you know, eight years before. Elodia Sanchez. She knew what she knew, and she stuck to it. There are people who were not impeached. And, you know... But the jury, my concern here is that the jury didn't agree with you. The jury was asking their verdict specifically for every single person, did they prove their case or not. So we have a jury verdict that no, this person, this person, Arsino, these people, did not prove their case, not just generically, but specifically. And you're not appealing that the evidence was, that that verdict was not sustainable by the evidence. Well, we would say that our goose was cooked, basically, by our third or fourth witness, because the themes that the defendant said were going to show were worn out by the objections. All I was asking you was that you're saying, well, there's some that were stronger than others, and I'm sure that's true, but that the jury made decisions discreetly as to every single one of them, not just a generic ruling, and that you did not appeal to us the sufficiency of the evidence to support the jury verdicts. That's true. We did not. Thank you. Okay. Thank you. We'll hear now from counsel for Evans-Fruit, I believe. May it please the court, my name is Justo Gonzalez of Stokes-Lawrence, California, Moorish Shore. I represent Evans-Fruit. Your Honors, I'll begin with the matters addressed by the EEOC. Firstly, this court reviews evidentiary rulings for abuse of discretion. To reverse based on an evidentiary ruling that is erroneous, this court must conclude both that the district court abused the broad discretion invested in district courts to make evidentiary rulings, and second, that prejudice ensued, and prejudice means more probably than not, the jury's verdict was tainted. In the briefing, it's apparent that the EEOC and Evans-Fruit disagree as to how this standard of review is applied on evidentiary rulings. The EEOC has suggested that there is a burden-shifting framework and a presumption under OBRI, a Ninth Circuit case from 2006. We disagree that that review applies because of the 2009 Supreme Court case of Shinseki v. Sanders. We cite in our briefing to Molina v. Astru, a 2011 case from the Ninth Circuit, which as far as we have discovered is the only case of the Ninth Circuit since Sanders was issued that has explicitly discussed both Sanders and the OBRI standard of burden-presumption shifting. The court in Molina v. Astru ruled that Sanders would apply the correct standard of review, that there was no burden-shifting, there was no presumption of prejudice, that the party benefiting from an erroneous evidentiary ruling did not have a burden to make a specified showing to overcome the presumption of prejudice. Now what the court in Molina did not do was explicitly abrogate OBRI, and I think that has led to some confusion that is apparent in the briefing in the parties today. And one of the problems is that they're both en banc decisions. I mean the OBRI opinion was en banc, and the estate of Bourbon was en banc. Right? That's correct. So OBRI has not been explicitly abrogated. However, our view and Evans-Fruit's view on appeal is that Shinseki v. Sanders does apply the correct standard for the reasons the Supreme Court explained in overturning the Federal Circuit. What can we do in terms of intervening law? But then what do we do with Molina? Molina applied the Sanders standard of disregarding the OBRI framework, and it applied Sanders, and the court simply stated we don't address that because we don't have to. And I don't think this court has to in this case. Along that line, let's say that we disagree with your position on burden of proof. Can we look at the evidence and make our own judgments about whether the proper burden of proof is satisfied or not, or not? We have that power. Exactly. Do we or don't we? Yes. We do? What case law do you have for that? This is where things get interesting, because since even Sanders, the Ninth Circuit case law, and I'm thinking specifically of all state insurance v. Herron, this court simply applied the HABOB framework, which is consistent with Sanders, but is a much older case, a pre-OBRI case. This court applied HABOB and simply applied the standard without even addressing OBRI, and that was a 2011 Ninth Circuit decision involving issues on appeal based on evidentiary errors by the trial court. Maybe my question wasn't clear. I do think it's hard, at least for me, to figure out who's got the burden of proof under Ninth Circuit law, but my question is, can we, once we decide who's got that burden of proof, if we feel that you didn't adequately, you didn't take the right line of authority to rely on, can we look at the record and make our own judgments on whatever we think the proper standard is? Well, I think the court has that inherent power to look at the appropriate standard on its own. We would simply argue that the appropriate standard is Sanders, but even under the OBRI standard, and this was the outcome in the Molina case, is that it doesn't matter in that case, because under either standard, the court on, the reviewing court, looked at the lower court's evidentiary rulings and decided that under the ordinary rules of the court, evidence under 403 couldn't say that the errors tainted the outcome of the case, the conclusions of the fact finder. And here we have 14 separate conclusions, actually 16, but as to liability, there were 14 separate independent conclusions by the jury. One, as to liability for each of the 14 claimants whose claims were submitted to the jury, there were in fact 15 claimants at the start of the trial, however, one of the claimants did not appear for trial and her claim was dismissed, and that was Karina Gutierrez. And the other two, since I mentioned it, the 16 decisions of the jury, the other two were that, in this contrast with the characterization of crew leads and of Juan Marin as high-level managers in the briefing and today's oral argument, the jury decided that crew leads were not supervisors under Title VII. That was in the verdict. The jury decided that Juan Marin was not a manager under state law. That was in the verdict. And it was based on the evidence, looking at the evidence as a whole, the evidence as to each individual claimant's case. That is the standard that the jury was instructed to in instruction number 8. And that brings, that would bring me, Your Honor, to one of the long-running issues in this case that has caused some concern is the blurring of distinctions between the evidence that is ordinarily admissible in a Title VII hostile work environment case and evidence that is ordinarily admissible in a disparate impact or pattern of practice case. And this is, these raise the issues of, that the appellants have described as the Morgan and the Hawkins issues. I'll begin with, since we've heard more about Morgan and affecting claimants Hernandez, you've seen Hernandez, claimants Barajas and Alvarez. Actually, no, the Morgan issue only affected Alvarez and Hernandez. The issue with the time-barred claims of these two claimants is very similar to, and the district court's treatment of evidence regarding these time-barred claims is very similar to this court's treatment of evidence of time-barred claims in Tennyson v. Circus Circus Entertainment. In that case, as in this case, the claimants sought to introduce evidence of the claimant's own, the plaintiff's own time-barred claims. The district court precluded that evidence from coming in under ER 403, or I'm sorry, under Rule 403 of the Federal Rules of Evidence. On review for the Ninth Circuit, this court held that that was an appropriate use of discretion because the danger of unfair prejudice and confusing of the issues substantially outweighed the probative value of the evidence of time-barred claims. So even though the law permits evidentiary use of time-barred evidence, not for a claim, but as evidence, it still is subject to the 403 balancing and the discretion of the court whether to admit that evidence or whether its remoteness diminishes the relevance. Is that what you're saying? Yes, Your Honor. And the time-barred claim of Euphorcina Hernandez, that event, whatever it was described as an attempted sex assault in a pickup truck, that event occurred sometime in the mid-90s. The 300-day cutoff in this case was October 22, 2005. So there had been potentially 10 or more years since that event occurred, and that was the analysis in Tennyson, that the time-barred claim was too remote and the conduct was different. Even though the conduct may have involved the same alleged harasser and victim, time had passed, the conduct was different. How was it different? I mean, it was two earlier events. I thought one of those, I'm getting the two not clear anymore, but I thought one of those time-barred events was fairly similar to the current charges. As to which claimant? Alvarez, I think. Alvarez's claim was actually, the time-barred claim was quite different. She had 11 years and then she came back. Correct, but I think she worked in 2001 and returned in 2008. Oh, the driving to the secluded location, I'm sorry, that was actually Hernandez, correct? The time-barred claim, yes. So I was just challenging your statement that the conduct was quite different. It seems to me that conduct there was really fairly similar. Ah, but that's the distinction, the blurring of lines that I was alluding to earlier. Hernandez's timely claim did not involve physical conduct or conduct of a physical nature. It involved verbal conduct. So you're saying maybe Hernandez's time-barred claim was similar to other claimants, but not similar to her. Correct. Okay, I see your argument. And that is the danger of unfair prejudice and confusing of issues that the district court considered in excluding that evidence, and that's consistent with Barry V. But it could, so your statement could come in for certain background, I will call flavor evidence, if the district court permitted that would probably not be a reversible error. That would have been subject to the court's discretion under the rules of evidence, just either to admit or exclude. Here, although the explanation... Oh, in fact, there's case law saying that it could have been admitted. I mean, it's not unadmissible. Oh, and we don't... It again goes down to abuse of discretion by the district court. That's exactly right. That is a call that the district court is entitled to make. That is rock-solid case law in the Ninth Circuit and at the Supreme Court on that issue. And that's what Morgan, the case principally relied on by the appellants, instructs. That isn't inherently fact. Any Title VII claim is going to be inherently fact-intensive, and the admission or exclusion of evidence will depend upon facts of the case and will be governed by the normal rules of evidence. Counsel, could I raise a question addressed by Mr. Loebsenz having to do with that comment in the summation about rich white people? He refers us to Romero Avila as being controlling on the question of prejudice. What's your response to Mr. Loebsenz? Well, that case is not controlling on the issue of prejudice because that case was predicated on the federal rules of criminal procedure, which explicitly exclude that type of argument and evidence in a criminal proceeding. This is not a criminal proceeding. Lawyers in civil proceedings are entitled to make impassioned arguments, frankly, in closing. That is what this Court held in Kerr. In the Kerr case, where the Court actually described the comments by counsel in closing as outrageous, yet, nonetheless, viewed in context of the case, in the entire case, viewing the evidence that is in the record and was in the record at trial, the Court did not come away with a clear conviction that there had been a miscarriage of justice, that the verdict was affected by that conduct. I'm concerned. I mean, I think that he also paints, you know, don't just try to take individual statements. You have to look at the mosaic that was painted, which was not only the rich white statement, but these economic statements that, you know, poor people lie because they're basically trying to build the system, is the underlying sense. And so I'd appreciate your comments on, you know, infusing their poverty and motive because of their poverty into the case. And again, under the case law, we need to look at the context of the record. The themes, as the Court alluded to earlier, one of the themes of the appellants at trial had two parts. And these were themes hit during opening arguments, during questioning of witnesses, and during closing rebuttal. The claimants are, quote, low-wage workers. They are Spanish-speaking only. The Evans, in contrast, in sharp contrast, have pocketfuls of money, and the people who fill those pocketbooks full of money, and the people who fill those pocketbooks were the claimants. And the Evans, Bill and Jeanette Evans, not generically the company, but Bill and Jeanette Evans, the owners of the company, turn their back on these low-wage Spanish-speaking workers. These were themes hit throughout trial. During questioning on direct of Jeanette Evans, counsel for the EEOC actually asked the question, isn't it true that you're so successful that the banks borrow from you? Evans sort of objected. The objection was sustained, but the question was asked. During direct examination of Juan Marin by the EEOC, he was asked, isn't it true that you were named in a lawsuit filed against Evans Fruit for hiring undocumented aliens? That is not a subject that Evans Fruit ever broached at any time at trial. Let me ask you, though, it's somewhat different to say, you know, you have the David and Goliath, you have the rich, you know, the low-income, versus because you're low-income, you're more inclined to lie because you're trying to falsify a claim in order to leverage your situation. I mean, that's qualitatively different. And that, I think, is what his argument was, so I'd appreciate if you could respond to that narrow argument. The answer to that narrower question is that in this case, that isolated statement, just about a sentence out of 48 pages of trial transcript that the closing took up, was connected to evidence in the record, including the multiple, the serial, really, impeachment of each claimant on prior and consistent statements. The impeachment of at least three of the claimants based on false statements they had made in the past to garner a pecuniary gain. Esther Abarca, for example, testified earlier in the proceeding. She admitted on the stand at trial that earlier in the same proceeding, she had perjured herself because she did not want to get caught in a phantom payroll scheme that she was apparently involved in. Norma Valdez admitted that she did, in fact, plead guilty to fraud in obtaining benefits, public benefits, in the past, and that was a misdemeanor, and I do want to point that out for the court. In our briefing, I believe, in the reply briefing of the appellants, this is pointed out, and they're absolutely accurate. In Evans-Fruit's answering brief, we identify that as a felony. It was, in fact, a misdemeanor, and the record cited by Evans-Fruit actually makes that very clear. It was a misdemeanor conviction. And the other claimant was Donelia Barajas, who was impeached at trial over statements that she had made and failures to disclose income in bankruptcy filings. So not only do we have that comment in the context of actual testimony at trial of these claimants, at least some of them, who did, in fact, lie for pecuniary gain in the past, we had 14 claimants, each of whom was confronted with inconsistent prior testimony, with inconsistent testimony with other claimants. So you're saying that it wasn't generically disbelieve them because they're poor, but rather we're showing specific instances of inconsistency, and then a sentence about motive, maybe. I agree that there's a lot of – I will say that this case, this trial, did not – I think that – well, it was uncomfortable all the way around, I thought. It was an intense, hard-fought trial, Your Honor, and a very difficult one for the trial court. I think that the Hawkins issue identified by the appellants, the hearsay rulings, were inherently very difficult. Many of the objections went one – went in favor of one side, went in favor of the other. But on the issue of Hawkins and the testimony of the first four claimants who testified, those claimants were never recalled by the plaintiffs in the case, by the appellants. Could they have been, would the judge have allowed it? I guess we don't know, and I guess if you don't make it – offer a proof, then – We have a very significant – we have very significant evidence in the record that the judge was inclined to permit it, because – He did allow some. He allowed recalling, but the issue of recalling witnesses specifically by the plaintiffs, by the appellants at trial, was broached on four occasions during trial. And those are citations to the record. On four occasions, the court asked, well, we may be recalling witnesses. Will any party be recalling witnesses? And before the parties rested their cases – rested and submitted the case to a jury, the court asked, will any witnesses be recalled? These – the fact that the first few claimants who testified were not recalled and there was no effort to recall them, I think, is very strong evidence that at trial, the appellants did not view the hearsay rulings as all that powerful or influential with the jury, because they chose to not recall them and to roll the dice. And with regard to the so-called inflammatory statements – I see I'm over my time, actually – I would just close on the brass ring statement by reiterating the incredibly high hurdle that the appellants have to overcome. For one thing, we believe – at first blush, we believe that this issue had actually been waived, but under the case law, it's more properly characterized as having been forfeited, leaving this court with the discretion whether or not to even consider the issue. But the fact that there was no objection to that comment and the very first time – and the interveners acknowledged this in the reply brief at page 20 – this is the first time the issue is being brought up on review, and most – under the appropriate standard of review of that statement for plain error, we have to consider that the statement was not objected to, there was no motion for mistrial, and it's being brought up for the first time on a – You're talking about the statement in the closing statement? The brass ring statement? Brass ring. Yeah, okay. Thank you. Thank you. You've used up your time, but I'm going to give you two minutes for rebuttal. Well, it seems as if there's a great deal of interest in Mr. – in the interveners' issue, and that really is more their issue. I was asked to say that the plain error standard is the same for civil and – and the – let's say the Byrd and the Jim Rowe case say it's the same standard for civil and criminal, and prejudice doesn't disappear just because the case is civil. The – with respect to the – and the interveners gave me a couple of statements. The claimants need money. You may consider that that is a powerful incentive to invent or exaggerate their stories. However sympathetic their financial situation may be. Is that so uncommon in trials, in summations, to suggest to the jury motives for various testimony that the jury heard? This kind of – no, in many circumstances. But this kind of evidence where you're questioning somebody's – really questioning their motive just because somebody maybe – Well, all I'm saying is that we've seen an awful lot of trial testimony and trials ourselves as lawyers where one of the purposes that are – summation is to say you've heard the evidence, and now let's see what kind of – behind that, what motives might explain that. Well, they started there, and they ended there. They started by saying that the people lied, and you can't trust the EEOC, you can't trust these people, and you can't – and if it were so bad, they would have complained. And they ended there, except they made it worse by then invoking the race card, the poverty card. And I would point out that we did object to the Rich White statement, and the court summarily overruled it. Thank you. So had we over – the same probably would have happened. Thank you for your rebuttal. Your time has expired. We'd like to thank all counsel this morning. We're going to now have the second case. So the first case of Elodia Sanchez v. Evans, Fruit, which is 13-35885, is submitted.
judges: O'scannlain, Ebel, McKeown